```
1                IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2
       - - - - - - - - - - - - - - - x
3      THE UNITED STATES OF AMERICA,
                                         Criminal Action No.
4                    Plaintiff,         1:21-cr-00004-CKK-1
                                         Friday, April 1, 2022
5      vs.                               10:03 a.m.

6      LONNIE LEROY COFFMAN,

7                    Defendant.
       - - - - - - - - - - - - - - - x
8

9      _____

10                 TRANSCRIPT OF SENTENCING TRANSCRIPT
            HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
11                    UNITED STATES DISTRICT JUDGE
       _____
12     APPEARANCES:

13     For the United States:      MICHAEL JUSTIN FRIEDMAN, ESQ.
                                   TARYN MEEKS, ESQ.
14                                 U.S. ATTORNEY'S OFFICE FOR D.C.
                                   555 Fourth Street, NW
15                                 Washington, DC 20530
                                   (202) 252-6765
16                                 michael.friedman@usdoj.gov

17     For the Defendant:         MANUEL J. RETURETA, ESQ.
                                   RETURETA & WASSEM, P.L.L.C.
18                                 300 New Jersey Avenue, NW
                                   Suite 900
19                                 Washington, DC 20001
                                   (202) 450-6119
20                                 mjr@returetawassem.com

21
       Court Reporter:            Lisa A. Moreira, RDR, CRR
22                                 Official Court Reporter
                                   U.S. Courthouse, Room 6718
23                                 333 Constitution Avenue, NW
                                   Washington, DC  20001
24                                 (202) 354-3187

25
```

```
 1                       P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Criminal Case 21-004 and
 3     Criminal Case 21-614, the United States vs. Lonnie Leroy
 4     Coffman.
 5              Counsel, would you please identify yourself for
 6     the record starting with the government.
 7              MR. FRIEDMAN:  Good morning, Your Honor; Michael
 8     Friedman for the United States.
 9              THE COURT:  Good morning.
10              MR. RETURETA:  Good morning, Your Honor; Manuel
11     Retureta on behalf of Mr. Coffman, who is present by video.
12              THE COURT:  All right.  Good morning.
13              Ms. Meeks?
14              MS. MEEKS:  Good morning, Your Honor, I apologize;
15     Taryn Meeks on behalf of the United States.
16              THE COURT:  And I see Sherry Baker, who is the
17     probation officer in the case.  Good morning.
18              THE PROBATION OFFICER:  Good morning, Your Honor.
19              THE COURT:  And good morning, Mr. Coffman.  I see
20     you as well.  Can you hear me?
21              THE DEFENDANT:  Good morning, Your Honor.
22              THE COURT:  Good morning.
23              THE DEFENDANT:  Yes, I can.
24              THE COURT:  All right.  So we're here for a
25     sentencing in two cases.  One is -- that started here in the
```

1    District of Columbia and the other one was transferred from

2    Alabama.

3           Let me just start by asking Mr. Coffman if he's

4    willing to proceed by video?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  All right.  So let me just set out

7    what we have.

8           There is a plea in both cases.  I'll call it the

9    D.C. case and the Alabama case.  The D.C. case is 21-cr -- I

10   think it's four zeros 14.  He pled guilty to Count 1,

11   possession of a registered firearm, which relates to

12   explosive devices, 11 Molotov cocktails.  The statutory

13   penalties are the maximum ten years in jail, maximum fine of

14   $10,000.

15          Count 2, which is a D.C. offense, unlike Count 1,

16   which is a federal offense, carrying a pistol without a

17   license outside the home or business.  And that is a maximum

18   of -- five years statutory maximum of jail and a maximum

19   fine of $12,500.

20          The Alabama case is 21-cr-614 -- I think it has

21   some zeros in front of it -- which is Count 1, possession of

22   an unregistered firearm.  Same charges as the one in the

23   D.C. case.  Again, the statutory maximum is ten years in

24   jail and a maximum of $10,000 fine.

25          What I have is the presentence report, the

1   government's memorandum in aid of sentencing, and it does

2   attach various exhibits as well as a statement of the

3   offense.  And mostly the photographs are of the weapons that

4   were found in the truck.

5           I do have the defendant's memorandum in aid of

6   sentencing, a handwritten letter from Mr. Coffman.  I also

7   received a letter in support from Denny and Yvonne Kay, and

8   I have made that letter available by sending it to you so

9   that everybody would have it.

10          So in terms of objections, the issue that has

11  arisen is that the government and the defense note the plea

12  agreement did not contemplate application of the U.S.

13  Sentencing Guidelines Section 3D1.2(d) section, which would

14  group related counts in two separate criminal cases if

15  there's no in between case or arrest.

16          The parties had agreed between 18 to 24 firearms

17  of various sorts for each violation, so they had done it

18  separately.  3D1.2 indicates that the total harm applies to

19  2K2.1, so the probation office's calculation for the Molotov

20  cocktails, destructive devices, also includes the

21  2K2.1(b)(1)(C).  So there would be a total of 20 firearms,

22  which would be found in the defendant's truck as well as his

23  home.

24          The difference is that with the way it was

25  calculated in the plea there would only be 12 points

1    enhancement, if you calculated according to what probation

2    did, which, frankly, I think is accurate.  Looking at the

3    sections, it would be six points.

4          So I would say I -- you know, the two calculations

5    are somewhat similar except for the one enhancement.  So

6    based on the plea that was included in the plea agreement,

7    the base offense would be 18, eight to 24 firearms, which

8    would be -- for each violation, which would be four points

9    extra; two points for the destructive device.  So it's -- 24

10   minus three points for acceptance of responsibility puts it

11   at a total offense level of 21.

12         He has no convictions, so it would be Criminal

13   History Category 1.  The range is 37 to 46 months.

14         The calculation that the -- and this Count 1 would

15   apply both to Count 1 in the -- I'll call it the D.C. case

16   and the Alabama case, if you don't mind, instead of my

17   trying to read the case number each time.  But the D.C. case

18   has that one calculation, and Count 1 in the Alabama case

19   would have the same calculation.

20         The probation office for Count 1 did Offense Level

21   18, which is the same, more than 25 as an aggregate, which

22   would put a six points enhancement, the two points for

23   destructive devices, which is the same, which comes to a

24   total of 26, minus the three for acceptance of

25   responsibility would put it in the total offense level of

1    23, not 21.  Again, Criminal History Category 1.  And in;

2    this it would be 46 to 57 months in Count 1 in both cases.

3          Now, Count 2 is a D.C. Code offense, and their

4    calculation would be between six to 24 months.

5          So the issue is the plea has one calculation; the

6    probation department has come with a different one.

7          I have to say, having gone through the advisory

8    sentencing guidelines sections, I think the probation office

9    is correct in terms of what the enhancement should be, six

10   points.

11         I did go through -- I got a transcript -- it's not

12   an official transcript; it's an unofficial one -- of the

13   plea hearing.  I had taken notes, but I wanted to go back

14   and refresh my recollection.  And in there -- because the

15   plea agreement itself says it's an estimate on the part of

16   both counsel; it may turn out to be different.  And if it

17   is, you cannot withdraw your plea or have a rescission.

18         I asked -- I went through the transcript, and I

19   six times -- there are six places where I tell the defendant

20   that; asked if he understood going over the plea letter that

21   it's the best guess for both counsel.  It may turn out to be

22   different; that probation is the one who actually does the

23   official calculation, although you do get to make

24   objections.  The Court is not bound by the calculations in

25   the plea letter, nor probation, and that you cannot withdraw

1    the sentencing or receive recision of the plea if the

2    calculation of the sentence turns out to be different.

3            So in addition, in the plea letter the government

4    had, under U.S. Guidelines 3A1.4 Comment 4, raised a

5    possibility of an upward departure.  The government has

6    decided not to request that.

7            The probation officer also raised the possibility

8    of an upward departure under 5K2.14.  I've decided, in going

9    through it, that -- and the government isn't asking for it

10   so I certainly wouldn't do it.  In terms of the probation,

11   though, I think it's possible that you could do that, but

12   I'm not.  So I'm not doing any upward departure.

13           So, at this point, Count 1 in both cases under the

14   appropriate probation department calculations is 46 to 57

15   months, not 37 to 46 months.  Count 2 is the six to 24

16   months.  And all of these would be concurrent.

17           So the justification for the upward departure of

18   the probation office would be the Molotov cocktails and

19   being near residences and government buildings, so it would

20   be Part E facts, but I've decided not to go over with that.

21           So what I do accept is the probation's

22   calculations and grouping.  So I'm not asking them to change

23   it in terms of -- because I think it's correct in terms of

24   how they've actually calculated it.

25           So in terms of the official one for both of the

1    two Counts 1, it's Base Offense 18, combined weapons for

2    both cases is six, for six destructive devices is 2; 26

3    minus three is 23.  Criminal history is 1.

4         So I'll find for those parts the presentence

5    report is undisputed, findings of fact pursuant to Federal

6    Rule of Criminal Procedure 32(i)(3)(A); and for those

7    disputed parts, which I'm assuming would be Mr. Retureta's

8    in terms of it not being the same as what is in the plea

9    agreement, those disputed parts are resolved.  It's findings

10   of fact pursuant to Federal Rule of Criminal Procedure

11   32(i)(3)(B).

12        I didn't see that, Mr. Retureta, you were actually

13   disagreeing with the calculation but were making an argument

14   that that was not what was in the plea letter that he agreed

15   to.  But in terms of the presentence report, I would adopt

16   it as written.

17        Now, the government has indicated -- and I'll hear

18   from the government, defense counsel, and the defendant, if

19   he wishes to address me, although he did provide me with a

20   handwritten letter.

21        The government has indicated -- and I want to

22   clarify, in terms of -- you said midpoint.  Are you using

23   what's in the plea agreement?  Is that what you're arguing?

24   Or are you arguing that it should be what is the correct

25   calculation and midpoint?  It wasn't clear to me what your

1    recommendation was, Mr. Friedman.

2           MR. FRIEDMAN:  Well, Your Honor, as we explained

3    in our memorandum in aid of sentencing, under the unique

4    circumstances of this case a term of imprisonment at the

5    midpoint of the agreed-upon sentencing guidelines range

6    would accomplish the various sentencing goals, so that would

7    mean the midpoint of the range in the plea agreement.

8           THE COURT:  So 37 to 46?

9           MR. FRIEDMAN:  Correct.

10          THE COURT:  What would you view as a midpoint?

11          MR. FRIEDMAN:  I believe the middle of that is 41

12   or 41 and a half months of imprisonment, 41 to 41 and a half

13   months; so that's around a three-and-a-half-year term of

14   imprisonment.

15          THE COURT:  Okay.  All right.  I just wanted to

16   clarify for the record that I had understood it correctly

17   that you were -- so are you asking for like a variance?

18   Because it's not a departure.

19          MR. FRIEDMAN:  No.  We're just submitting that a

20   sentence at the midpoint of the agreed-upon range would be

21   just and appropriate under all the circumstances.

22          THE COURT:  Okay.  But what I'm saying to you is

23   from the Court's perspective, technically the actual

24   calculation would not be the 37 to 46; and, therefore, if

25   you're asking for the plea -- and I understand that's what

1    you want since you proposed it in the plea with the lower

2    total offense level, which gives it a lower sentencing

3    guideline range, that you're working with that.

4            In order not to go with what's in the official and

5    correct calculation, it's not a departure.  I'm assuming

6    you're asking for a variance.

7            You have to be asking for something.  You're not

8    asking for what it officially is.

9            MR. FRIEDMAN:  Your Honor is the only authority

10   that can decide in the end what is the sentencing guidelines

11   range, so --

12           THE COURT:  Okay.  But I've told you --

13           MR. FRIEDMAN:  Yes, it would be a variance.

14           THE COURT:  Okay.  All right.

15           I have to be -- I want to make sure that we do the

16   record correctly in terms of -- because it's not.  I think,

17   going through it, probation is correct with the calculation.

18   It's not something evidently contemplated by the two lawyers

19   when you did it.

20           So you're relying on the plea letter, just to make

21   sure, which is different than the official calculation based

22   on a variance that you would honor the agreement you made

23   with the defendant and would support a midpoint using the 37

24   to 46 range.  Am I accurate?

25           MR. FRIEDMAN:  Yes.

1          THE COURT:  Okay.  Then let me move to just, you

2     know, whatever else you two wish to say.  I just wanted to

3     clarify on the record.

4          MR. FRIEDMAN:  Yes, Your Honor.

5          THE COURT:  The government first, defense counsel,

6     and then the defendant, if he wants to supplement anything

7     beyond his letter.

8          MR. FRIEDMAN:  Your Honor, the defendant,

9     Mr. Coffman, committed serious federal criminal offenses by

10    unlawfully possessing the component parts to make Molotov

11    cocktail incendiary devices in Washington, D.C., and in

12    Alabama, and he violated the laws of the District of

13    Columbia by possessing additional firearms and ammunition

14    and by carrying firearms on his person on January 6th.

15          The combination of gasoline and Styrofoam and the

16    mason jars made for a particularly dangerous incendiary

17    device.  The substantial collection of weapons in his pick-

18    up truck also included large capacity ammunition feeding

19    devices, a crossbow with bolts, machete, camouflage smoke

20    devices, and a stun gun.

21          This criminal conduct endangered the community.

22    The defendant transported these weapons across state lines

23    and left them unsecured in his pick-up truck.  The pick-up

24    truck was parked in a part of Washington, D.C., close to

25    residences and government buildings, including the U.S.

1   Capitol Building.

2         The defendant possessed the weapons on a day and

3   at a time when he was engaged in political-related activity.

4   The defendant came to Washington with the aim of

5   investigating the integrity of the presidential election and

6   to attend a political rally on the morning of January 6th on

7   the National Mall.  Possession of such dangerous weapons in

8   our nation's capital is uniquely offensive to our cherished

9   democratic political traditions.

10         The defendant also did the right thing by

11   accepting responsibility for his conduct by pleading guilty.

12   He is a 72-year-old citizen of the United States with no

13   prior arrests and no criminal convictions.

14         As a young man, the defendant enlisted in the

15   United States Army, and he served in the Vietnam War.  He

16   received a GED while serving in the military, and he had a

17   29-year history of employment in Alabama before retirement.

18         The defendant appears to have had strong family

19   ties throughout much of his life with some estrangement from

20   family members in recent years around the time frame of his

21   deeply concerning militia-related activity.  As we explained

22   in our memorandum in aid of sentencing, the defendant was

23   identified by law enforcement several years ago as a

24   participant at an armed gathering of militia groups in

25   Texas, and he possessed militia-related information when he

1  was arrested on January 6, 2021.

2          The sentence imposed today should send a message

3  to the defendant and to the public that unlawful possession

4  of weapons, including homemade incendiary devices like

5  Molotov cocktails, will not be tolerated.  The sentence

6  should also impose an appropriate punishment and protect the

7  public from future misconduct.

8          As we explained in our memorandum in aid of

9  sentencing, in the unique sentencing in this case a term of

10  imprisonment at the midpoint of the agreed-upon guidelines

11  range will accomplish these sentencing goals.  The terms of

12  imprisonment for the three offenses should be served

13  concurrently consistent with Section 5G1.3 of the

14  guidelines.

15          Additionally, the Court should impose a three-

16  year term of supervised release upon the defendant's release

17  from the term of imprisonment, which will provide additional

18  deterrence and protection to the public.  The defendant

19  should be required to participate in mental health

20  evaluation and treatment, which will help serve core

21  sentencing goals and help ensure the defendant's successful

22  reentry to the community.

23          THE COURT:  All right.  Mr. Retureta.

24          The concurrent terms is not in dispute.  That's, I

25  think, required.

1          MR. RETURETA:  Thank you, Your Honor.

2          On behalf of Mr. Coffman, I began representing him

3     in the spring of last year.  I encountered a gentleman with

4     a proud background.  I encountered a gentleman with a strong

5     family structure around him.  I have talked with members of

6     that family and their concern for him.

7          I have seen him go through many phases throughout

8     this time period, but what I have seen consistent throughout

9     my time with him has been, number one, an acceptance of

10    responsibility for the crimes that were charged and what he

11    pled guilty to.  There is no doubt in that.  I think his

12    letter speaks clearly and succinctly to what his thoughts

13    are on what he did and should not have done.

14         That has also spilled over into his sit-down and

15    conversation with government officials.  I think it is

16    because of that time that he met with government officials

17    that we have this plea before us, that we have the

18    government recognizing that Mr. Coffman came to Washington,

19    D.C., of his own volition; that he wanted to find out for

20    himself; that he did not coordinate; that he did not

21    communicate with anyone else.

22         And it was clear, to understand the government's

23    concern once they began this case, that that might be the

24    case, but it was also just as clear when they realized that

25    this was Mr. Coffman acting on his own.  I draw the Court's

1    attention to one aspect of that day on January 6th, which I

2    think kind of exemplifies Mr. Coffman and what he was not

3    and who he truly is.

4         The Court is aware that once the rally near the

5    Washington Monument was concluding, he left.  He seemed

6    disillusioned by what was happening and maybe the things

7    that he wanted to find out were not being discussed.  He

8    bypassed the Capitol.  He did not participate in any of the

9    conduct that was happening there.  He went back to his

10   truck.

11        Upon going back to his truck -- at that point in

12   time there had already been a law enforcement perimeter

13   established around the Democratic National Committee because

14   of the suspected pipe bombs that were found there -- he met

15   with a woman who felt sorry for him and who also had her

16   vehicle within that law enforcement perimeter, and she kind

17   of felt sorry for him.  It was cold.  They didn't know what

18   to do, and they ended up going -- jumping on the Metro and

19   going to Pentagon City and sharing a pizza.  She then --

20   they then came back.

21        They then approached the perimeter again, and

22   Mr. Coffman met with police officers and said, "That's my

23   truck."  There was never a moment of trying to cover up.

24   There was never a moment of trying to evade responsibility.

25   And more importantly, with this woman at that moment in

1    time, there was never a moment where Mr. Coffman shared any

2    other ambition for that day, any other activity that he was

3    thinking of, which I think gave the government the ability

4    to say what I previously said.  Mr. Coffman came here on his

5    own.  Mr. Coffman wanted to see -- wanted answers to some of

6    the questions he had about the election.

7            And I think it's exemplary of Mr. Coffman in the

8    sense that he's been honest throughout.  He's accepted

9    responsibility throughout.  And I think that's important for

10   the Court in terms of punishment, in terms of deterrence for

11   him, which I think is accomplished given what he has done

12   through being in jail at the D.C. facility since January 6th

13   and being now, as the Court sees, at the Bureau of Prison

14   facility at USP Lewisburg with the transfer done by the

15   marshals because of the conditions at the D.C. Jail and CTF

16   facilities.

17           He's gone through a lot.  And the Court knows what

18   he carries with him in terms of his health issues, mental

19   health issues.  And my last conversation with him was on

20   Tuesday where he informed me that the medical facility there

21   at Lewisburg did confirm that he will need a shoulder

22   replacement.  Your Honor may recall that he was trying to

23   get an MRI --

24           THE COURT:  The MRI.

25           MR. RETURETA:  -- at D.C. Jail, and Lewisburg was

1    able to conduct a series of x-rays which confirmed that.

2         I raise that point because Mr. Coffman will have

3    plenty ahead of him in terms of medical and mental health

4    treatment, and I think that that is the key for the Court to

5    consider.  Perhaps that is not -- that goal is not best

6    reached by facilities within BOP.

7         I think he has endured a strong, strong period of

8    incarceration.  I think that further incarceration would not

9    be the appropriate sentence for him.  I think he has given

10   up rights that he has held for many -- for his entire life

11   in regards to firearms.  Those are now gone.  And there are

12   other aspects of what he has endured that I think suffice

13   for a just punishment as it relates to incarceration.

14        I can tell Your Honor, just by spending time with

15   him, he is a gentleman.  He cares for his family.  They have

16   been with him throughout.  There was -- I know that we're

17   talking about -- that he officially divorced from his wife,

18   May, but the first time that I spoke with her she informed

19   me that they had just completed their 50th year of being

20   married, and so they are still very close.  His son and

21   daughter are very close, and others around him are close.

22        Your Honor received that letter, as I received it,

23   in the last couple of days.  There are also some messages

24   that I had received through messaging from other individuals

25   that have spent time with him in the jail facilities and

1    spoke very highly of him.

2            We ask the Court to consider that incarceration

3    for him at this point in time at the age of 72 and his

4    medical conditions is not the appropriate sentence.  He

5    should be back in Alabama.  He should be going to the VA.

6    He should be seeking medical treatment.  He should be

7    receiving mental health treatment and being supervised.

8            I think that is the key component to this because

9    I think, maybe in a year, if the Court does decide to impose

10   some type of punishment, we may be coming back with a

11   compassionate issue just because of everything he has going

12   on.  So we would ask the Court to consider that.

13           Should the Court decide that some type of

14   incarceration is necessary, we have included in our

15   memorandum a request for recommendation for a BOP medical

16   facility.  We would ask that.  We would ask the Court not to

17   impose any fine as that is not -- he's not capable to pay

18   such a fine.

19           And we turn back to, I think, one of the strongest

20   things, which is that letter that he provided you.  He wrote

21   that letter -- shoot, it must be now about four or five

22   months ago.  He presented it to me and humbly he said,

23   "Should I change anything?  Should I do anything?"

24           I said, "Mr. Coffman, don't change a word.  This

25   is what you've always told me from Day 1.  This is what you

1    did.  This is what you believe."

2          And I think that speaks volumes for who he is,

3    what he did, how he feels about it, and the consequences

4    that he has endured and will continue to endure into the

5    future.

6          So with that, we would submit, Your Honor.

7          THE COURT:  All right.  Mr. Coffman, I have your

8    letter.  And I get a lot of letters from defendants, and I

9    must say this is one that I think you wrote.  It's not -- I

10   don't see the fine hand of lawyers in it, which occasionally

11   you do.  This is clearly your writing and your views, so I

12   appreciate that, and I will certainly take that into

13   account.

14          But if you would like to say something additional,

15   you can at this time.  You don't have to; but if you wish

16   to, you can.

17          THE DEFENDANT:  Your Honor, if I can --

18          THE COURT:  You need to -- we're having trouble

19   hearing you.

20          THE DEFENDANT:  Your Honor, if I can keep my

21   composure, I do have a little bit here on my mind.  But I

22   tell you I have (inaudible) January 6th.  I have wished many

23   times that I had stayed home.

24          I am one of nine children.  I'm the sixth child

25   with five sisters above me, and all but one of those sisters

1    has passed on.  I have one sister left.  She's 76 and not in

2    good health, but if I were home, I would be spending most of

3    my time with her.  And she didn't want me to go to this

4    rally, but I felt I needed to.

5             Your Honor, I've never been in court.  I've

6    never been charged with anything, and this is the most

7    (inaudible) -- this has been a nightmare; my sentence in

8    D.C., my sentence in Lewisburg.

9             There was an inmate in D.C. that was beaten

10   severely by the guards while his hands were zip-tied behind

11   his back.  He is now here in this facility, and (inaudible)

12   he has provided me (inaudible) and severe issues with one of

13   his eyes.

14            And I got COVID.  Initially that's what they said

15   it was.  I thought it was just a head cold, but they put me

16   in quarantine for two weeks and I -- quarantine is just like

17   being punished.

18            Your Honor, this is the first political rally I

19   have ever attended, and I wouldn't have gone to this one had

20   it not been for the fraudulent accusations about the voting

21   fraud.

22            I still love my wife, ex-wife I guess.  She has

23   made -- has given me every reason to believe that she would

24   be willing to get back together if I get home.

25            That's all I have, Your Honor.

1              THE COURT:  All right.  What I'd like to do is to

2      take about five minutes.  I'm going to just get off the

3      video, look at my notes, and then I'll come back.

4              Don't go away, all right?  Because it's too much

5      trouble to get everybody back.

6              And so, Mr. Coffman, you just stay there as well.

7      I just want to look at my notes and think through what

8      everybody has provided to me.

9              (Recess taken)

10             THE COURT:  All right.  In addition to the

11     advisory sentencing guidelines, the Court considers the

12     pleadings, argument, record in this case, in addition to the

13     following information in determining a fair, appropriate,

14     and reasonable sentence in conformance with the factors set

15     out in 18 USC 3553(a) and subsequent sections.

16             Mr. Coffman is 72 years old.  He has no criminal

17     record.

18             In terms of education, he received his GED while

19     he was in the military in 1969.

20             In terms of job history, he's retired now, but

21     worked from 1983 to 2012 at Nicholson, a manufacturer of

22     machine-made files.  He was a machine operator, and he

23     worked there for 29 years and retired in 2012.

24             In 1968 he enlisted in the U.S. Army.  He was

25     under age at the time.  He spent two tours in Vietnam, and

1    he was honorably discharged in 1976.

2            In terms of finances, the FBI seized his pick-up

3    truck.  Evidently his sister returned to the lender his

4    other van.  His home is the only asset.  I find he has no

5    financial ability to pay a fine.

6            Substance abuse.  There are no issues.

7            Mental health, emotional health.  He self-reports

8    severe depression, and the jail records do indicate that

9    there is depression, not just situational but perhaps beyond

10   that.

11           He will say he has been taking a medication, an

12   antidepressant.  It's unclear if he's been consistently

13   taking it, at least according to family members.  He clearly

14   needs a mental evaluation and treatment, if appropriate.  As

15   far as I can tell for mental health, he has not been going

16   to the VA for this treatment.

17           Physical condition.  He's not vaccinated.

18   Evidently he just told me he had COVID, which I was not

19   aware of.  The D.C. Jail or VA records, the releases were

20   signed too late to actually get the actual records.

21           So the probation office did contact the D.C. Jail

22   to get a summary of their records in terms of his conditions

23   and his medication, and I do have that email.  I asked to

24   have it forwarded to both the government and defense

25   counsel.

1    We don't actually have the records, but they

2  indicate stress, hip pain, left shoulder and upper arm,

3  which evidently needs to be looked at, COPD, various chronic

4  pains in the rest of his body, back pain, opioid dependence,

5  a various series of different things, and he's on a fair

6  amount of medication at the present time.  So he does have

7  issues that need to be addressed in terms of the medical

8  condition.

9    On a personal basis, he was born into an intact

10  union.  His parents were share croppers.  Both are deceased

11  now.  Though finances were tight when he was growing up,

12  there were no other issues in the home.  The parents were

13  married for 70 years.

14    He had originally eight siblings.  Five are now

15  deceased; three are living.  He's closest to his sister,

16  Faye, F-A-Y-E, although she also has COPD, and her cancer is

17  in remission.  She's now retired.  She worked in the kitchen

18  of a nursing home.

19    The other remaining living sibling is a brother

20  who is on disability or retired originally from a

21  manufacturing job.

22    In 1971 Mr. Coffman got married.  The divorce was

23  finalized in 2019.  It's an amicable relationship between

24  the two of them.  The ex-wife had a stroke and is partially

25  blind in both eyes.

1          There are two children of this union.  One is a

2     manager at a concrete plant.  The other is a lab technician,

3     and she lives with her mother.

4          In terms of the statement of offense, I'm going to

5     do a combination of the statement of offense that he

6     actually signed, and then there's some additional

7     information that the government did present to me that is

8     unrebutted.

9          On January 6, 2021, a joint session of the United

10    States Congress was scheduled to convene at the U.S. Capitol

11    in Washington, D.C., and that was to certify the vote count

12    of the Electoral College of the 2020 Presidential Election,

13    which had taken place on November 3, 2020.

14         At around 9:15 that morning, the defendant parked

15    his red GMC Sierra pick-up truck in the 300 block of First

16    Street in Southeast, D.C.  The defendant had driven the

17    pick-up truck from his home state of Alabama to D.C. and

18    into the D.C. area several days earlier.  He parked it in an

19    area that was proximate to personal residences and numerous

20    government buildings, including the Capitol.

21         The pick-up truck contained several loaded

22    firearms within arms reach of the driver's seat.  What was

23    included in the pick-up truck was a nine-millimeter Hi-Point

24    handgun in the front right passenger seat, and then I

25    believe under the rear seat was a Windham Weaponry rifle and

1    a Hatfield Gun Company SAS shotgun.  Also inside the pick-up

2    truck in its covered bed were hundreds of rounds of

3    ammunition, large capacity ammunition feeding devices, a

4    crossbow with bolts, machetes, camouflage smoke devices, a

5    stun gun, cloth rags, lighters, a cooler containing 11 mason

6    jars, and other items.

7         The 11 mason jars and the cooler each had a hole

8    punched in the lid and each hole was filled with a golf tee.

9    Each mason jar contained a mixture of gasoline and

10   Styrofoam.  The mason jars and their contents, lighters, and

11   cloth rags made up their component parts of Molotov

12   cocktails, a term for bottle-based improvised incendiary

13   weapons.  These items constituted a combination of parts

14   designed or intended to be used in converting any device

15   into a destructive device as it's defined under the statute.

16        The defendant exited his pick-up truck at around

17   9:20, walked in the direction of the U.S. Capitol toward a

18   rally planned for that morning near the National Mall.

19        As the defendant walked in D.C. that morning and

20   throughout the day he knowingly carried on his person two

21   additional loaded firearms, both classified as pistols that

22   were designed to be fired by use of a single hand and had a

23   barrel less than 12 inches in length; the nine millimeter

24   Smith & Wesson handgun and a .22 caliber North American Arms

25   revolver.  The defendant had not registered any firearms or

1     destructive devices in the National Firearms Registry and

2     Transfer Record, nor did he have a license.

3          Twelve additional mason jars were later discovered

4     at the defendant's residence in Falkville, Alabama.  These

5     mason jars each had a hole punched in the lid and contained

6     gasoline.  Nine of these jars contained a material

7     consistent with polystyrene from which Styrofoam is made in

8     addition to the gasoline.  The mason jars and their contents

9     made up the component parts of Molotov cocktails, a term for

10    bottle-based improvised incendiary weapons.  These items

11    constituted a combination of parts designed or intended for

12    use in converting any device into a destructive device as

13    that term in defined under the statute.

14         The defendant made these items at some point prior

15    to his departure from Alabama bound for D.C., and he left

16    Alabama on or about January 1st of 2021.  Again, he had not

17    registered any firearms or destructive devices.

18         A government explosive enforcement officer

19    determined that the combination of melted Styrofoam and

20    gasoline in a Molotov cocktail has, quote, the effective of

21    napalm insofar as it causes the flammable liquid to better

22    stick to objects that it hits, unquote.

23         In addition to the weapons and the ammunition, law

24    enforcement recovered handwritten notes from the defendant's

25    pick-up truck including a quote attributed to Abraham

1   Lincoln stating, quote, We the people are the rightful

2   masters of both the Congress and the courts, not to

3   overthrow the Constitution, but to overthrow the men who

4   pervert the Constitution.  The handwritten notes also

5   included a listing of individuals, some identified as good

6   guys and bad guys, with a federal judge listed among the

7   latter bad guys.

8           Handwritten notes in the defendant's wallet on

9   January 6th included contact information for an individual

10  identified by law enforcement as a member of a Southeast

11  Texas militia group known as the American Patriots.  The

12  handwritten notes also included an address for a purported

13  gathering place in Texas called Camp Lone Star where militia

14  groups had purportedly sought to patrol the border looking

15  for illegal aliens.  Law enforcement had previously

16  identified the defendant as a participant at Camp Lone Star

17  where he was armed with a shotgun and a nine-millimeter

18  pistol.

19          Additional militia-related documents were located

20  by law enforcement at the defendant's residence in Alabama

21  as well as another handwritten list of public figures with a

22  heading that read, quote, Used white pages to locate people,

23  unquote.

24          The list identified various public figures with

25  descriptions next to their names, including ex-dem senator,

1    billionaire, leftist traitor, radical dem senator,

2    billionaire, oilman and fundraiser for Obama, and others.

3          Finally, the defendant had traveled to D.C. the

4    month prior to his arrest, and on December 11, 2020, he

5    attempted to drive to the residence of a United States

6    senator and also called the senator in an effort to help

7    with the election fraud he saw.  A staff member at the

8    senator's office recorded the call.  Although they

9    characterize it as not threatening, it was unclear as to

10   precisely what he was asking.  I'll put it that way.

11         In terms of parity, which defense counsel has

12   indicated, he cited cases with mostly verbal threats.

13   Although the defendant in some of those cases did have

14   weapons, they did not involve what I would view as weapons

15   of destruction which were some of the incendiary devices, so

16   I don't see it's totally fitting.  And to be frank, I don't

17   think in all my years as a judge I have had quite such a

18   collection of weapons that I've had to deal with.  Certainly

19   guns, yes, all types, and ammunition and various things, but

20   the collection of them, particularly the Molotov cocktails,

21   does concern me.

22         So in terms of sentencing, if you look at the 3553

23   factors, these are very serious offenses.  I mean, this is a

24   large number of guns unlicensed and unregistered, a large

25   amount of ammunition, machetes, large capacity ammo feeding

1    devices, a crossbow, and these Molotov cocktails with the

2    ingredients where you could make it into napalm.  None of

3    these items are benign, and collectively they're certainly

4    very dangerous.

5            The key unanswered question for me, which is still

6    frankly unanswered and probably won't be able to be

7    answered, is what was the purpose of driving all the way

8    from Alabama to D.C. with these destructive items in his

9    possession?  And also, the purpose of having them in

10   Alabama, particularly the Molotov cocktails, and certainly

11   driving to D.C.  Although he didn't participate in any of

12   the insurrection activities at the Capitol, it certainly was

13   the day of the insurrection.

14           He spent two tours in Vietnam, so he certainly

15   knows what napalm can do.  It's certainly more dangerous

16   than just plain old Molotov cocktails.

17           Of concern as well are the notes listing public

18   figures with negative comments, so congressional as well as

19   other individuals as good or bad guys.  Lists are always

20   concerning.  Even if additional threats aren't made, they're

21   certainly on a list that -- you know, that is, by itself, an

22   additional concern.

23           Also, he's an armed member of a militia group,

24   although the group seems to be more concerned about

25   immigration than other issues.

1          Now, balanced against that, we have that he's a

2     veteran.  He spent two tours in Vietnam.  He enlisted; he

3     wasn't drafted, since there was a draft at that point.  He,

4     you know, enlisted early in terms of getting in, and it

5     certainly was a difficult and unpopular war in terms of his,

6     you know, going forward and, you know, fighting on behalf of

7     the United States.

8          He has no prior criminal history.  He does have a

9     very solid work history.  He entered a plea.  He has not

10    equivocated.  I see the letter shows remorse and

11    understanding that this was something he should not have

12    done.

13         He did no damage while in D.C.  He didn't

14    participate in any of the insurrection activities which were

15    going on at the time, and I have to say his letter was

16    something that I considered very carefully.  As I indicated,

17    I thought it was something he wrote, not somebody else

18    giving him ideas.  It seemed to come from something that he

19    is -- he would say, which I've taken into account and

20    probably given more weight than sometimes I give these

21    letters.

22         He has rehabilitation needs.  He needs a mental

23    health evaluation, treatment, medication, if appropriate.

24    He certainly has several physical medical issues.  He needs

25    to have, you know, some medical tests, some procedures, and

1     it sounds like he may need some surgery on his shoulder.

2              So sort of in summary of where I am looking at the

3     factors, the serious offense -- and I can't get away from

4     it.  I mean, he had like almost a small armory in his truck

5     ready to do battle, and I still don't have an explanation of

6     why you would have all of this; the quantity of weapons, the

7     notes, the -- you know, the Molotov cocktails that could be

8     very destructive.

9              In terms of deterring him, I think the letter --

10    he seems to have -- this arrest has certainly gotten his

11    attention.  Deterrence to others, which I think would be of

12    concern and of interest, particularly, hopefully that those

13    who might consider doing this in terms of coming to D.C.

14    around residences and government buildings would give

15    careful consideration as to what would be facing them if

16    they were arrested.

17             Just punishment, that needs to be considered.

18             I struggled somewhat with the issue of an

19    appropriate sentence noting the plea on the one hand, which

20    has one lower guideline, and the guideline range, which I

21    think is the appropriate one, which has a different range

22    and obviously a higher one.  There is 46 months at the top

23    end of the guideline under the plea, and it's at the bottom

24    of what I think is the appropriate guideline.

25             I also will take into account the government's

1   recommendation where they're recommending that the lower

2   guideline range in the plea agreement should be the one that

3   the Court should use, and out of that that it should be at

4   the midpoint actually in that.

5         I've decided that I think the appropriate sentence

6   is 46 months.  It happens to be the -- I decided that

7   separately, but it happens to be the top of the plea and the

8   bottom of the actual calculation that we think is the

9   correct one.  But I think in considering everything, that

10  that is the correct way to do this.

11        So pursuant to the Sentencing Reform Act of 1984

12  and in consideration of the provisions of 18 USC 3553, as

13  well as the advisory sentencing guidelines, it is the

14  judgment of the Court that you, Lonnie Coffman, are hereby

15  committed to the custody of the Bureau of Prisons for

16  concurrent terms of 46 months on Count 1 in Case 21-cr-00004

17  and Count 1 in 21-cr-00614 and a concurrent term of 15

18  months -- one year and three months -- on Count 2 in Case

19  21-cr-0004.

20        You're hereby sentenced to serve -- so it all

21  comes to -- since it's all concurrent, it's 46 months.

22        You're further sentenced to serve concurrent terms

23  of 36 months -- three years -- of supervised release as to

24  Counts 1 and 2 in Case 21-cr-00004 and Count 1 in Case

25  21-cr-00614.  You are ordered to pay a special assessment of

1    $100 on Counts 1 and 2 and $100 on the D.C. offense in Case

2    No. 21-cr-00614.

3            I will recommend Butner.  I think it is the

4    medical facility.  They do have different levels of care

5    there as well as they do have mental health services.

6    It's -- I think probably there are other places that have

7    services, but I think that also its location would be on the

8    East Coast and closer to where his family would be.

9            While on supervision, you shall abide by the

10   following mandatory conditions as well as the standard

11   conditions of supervision which are imposed to establish the

12   basic expectations for your conduct while on supervision.

13   The mandatory conditions include you must not commit another

14   federal, state, or local crime.  You must not unlawfully

15   possess a controlled substance.  You must refrain from any

16   unlawful use of a controlled substance.  You must submit to

17   one drug test within 15 days of placement on supervision and

18   at least two periodic drug tests thereafter as determined by

19   the Court.  You must cooperate in the collection of DNA as

20   directed by the probation officer.

21           There is nothing else.  You will get credit for

22   time served since January 6th of 2021.

23           You'll comply with the following special

24   conditions.

25           Mental health.  You must participate in a mental

1   health treatment program and follow the rules and

2   regulations of that program.  The probation officer, in

3   consultation with the treatment provider, will supervise

4   your participation.  And there can be a decision as to

5   whether you need medication.

6          The reentry progress hearing.  Within 60 days of

7   release from incarceration or placement on supervision

8   you'll appear before the Court for a reentry progress

9   hearing.  The probation office, before that, will submit a

10  report summarizing your status, compliance with release

11  conditions, and, if you're going to be supervised by a

12  district outside of D.C., the U.S. probation office in that

13  district may submit a progress report to the Court within 60

14  days of the commencement of supervision.  And then upon

15  receipt of the progress report, I'll decide whether your

16  appearance is required and whether to transfer jurisdiction.

17         So at this point, when you're released, you'll be

18  dealing with D.C.  Whenever you go back, I assume, to

19  Alabama, they probably will supervise you there, although

20  they then will provide information to D.C.  At some point it

21  may be appropriate to transfer jurisdiction and have it all

22  handled in Alabama.

23         The Court finds you don't have the ability to pay

24  a fine and waives imposition of a fine in this case.

25         The financial obligations are -- which are the

1    special assessments -- immediately payable to the Clerk of

2    the Court.  Within 30 days of any change of address -- this

3    is obviously when you get out -- you shall notify the Clerk

4    of the Court of the change until such time as the financial

5    obligation is paid in full.

6           The financial obligation is immediately payable to

7    the D.C. Superior Court, and that's the one that you have

8    with the one charge, which is Count 2 in the D.C. case.

9    That is deposited into the Crime Victims Compensation Fund.

10    And, again, within 30 days of any change of address you need

11    to let them know of the change until you've paid that

12    obligation.

13           So the obligations are on the two felony charges

14    and then -- which go to the federal court here, and then one

15    that goes to the D.C. Superior Court.

16           The probation office shall release the presentence

17    investigation report to all appropriate agencies, which

18    includes the U.S. Probation Office in the approved district

19    of residence in order to execute the sentence of the Court.

20    Treatment agencies shall return the presentence report to

21    the probation office upon the defendant's completion or

22    termination from treatment.

23           Pursuant to the statute, you have a right to

24    appeal the sentence imposed by the Court if the period of

25    imprisonment is longer than the statutory maximum, which

1     it's not, or the sentence departs upward from the sentencing

2     guidelines.  I did not do an upward departure, and I've

3     actually used a combination of -- it fits -- the sentence

4     fits the plea agreement and also fits what I think is the

5     official sentencing guideline range.  If you feel that

6     there's something there to appeal, you have to file it

7     within 14 days after the Court enters judgment.

8          As defined in 28 USC 2255, you also have the right

9     to challenge the conviction or sentence if new and currently

10    unavailable information becomes available or on a claim that

11    you received ineffective assistance of counsel in entering a

12    plea of guilty to the offenses of conviction or in

13    connection with the sentencing.

14         Again, if you're unable to afford the cost of an

15    appeal, you can request permission from the Court to file it

16    without cost to you and also ask that counsel be appointed

17    to represent you.

18         Now, there's an opinion that came down in 2016,

19    the *Hunter* case, which does require us to ask if there are

20    any objections or any other matters that I need to deal with

21    that we have not already discussed.

22         So let me start with probation.  Is there anything

23    else that needs to be addressed, Ms. Baker?

24         THE PROBATION OFFICER:  Good morning, Your Honor.

25    Does the Court want us to amend the presentence report to

1    include the medical records or the medical information from

2    D.C. Jail?

3            THE COURT:  I think it would be helpful to do so

4    so -- because the Bureau of Prisons will receive the

5    presentence report, and that will alert them that there are

6    records that they should get from the D.C. Jail.

7            My suggestion, Mr. Retureta, is that there is an

8    office that the Bureau of Prisons has -- and probation can

9    tell you where it is, who it is -- that makes the decision

10   of designations, and I will recommend what I've talked about

11   in terms of Butner.  You should give any medical records

12   that you have from the jail to them so when they're making

13   the decision they actually have them.

14           But I would ask that you amend it to put that

15   information in there so when they look at the presentence

16   report they'll see he has a bunch of medical issues, and

17   if you give them the records, that will also -- including

18   the need for the surgery, it will also inform their

19   designation.

20           Mr. Friedman, anything else from you that I need

21   to address?

22           MR. FRIEDMAN:  No, Your Honor.

23           THE COURT:  Okay.  Mr. Retureta, anything from

24   you?

25           MR. RETURETA:  Your Honor, I believe we need to

 1    dismiss the remaining counts of the D.C. case.

 2              And addressing the medical records, we will.  I'm

 3    familiar with the BOP office that does the calculation and

 4    designation.  We will forward the material to that office.

 5              THE COURT:  Great.

 6              Ms. Baker, do you have the actual records, or did

 7    you just get the listing?  I know you have to unmute.

 8              THE PROBATION OFFICER:  Your Honor, I did actually

 9    receive the medical records via fax from D.C. Jail.

10              THE COURT:  Okay.  So, Mr. Retureta, you may just

11    want to get them from Ms. Baker.  It's probably faster than

12    trying to get them from the jail.

13              MR. RETURETA:  Certainly, Your Honor.

14              THE COURT:  All right.  Dorothy, anything else?

15              THE COURTROOM DEPUTY:  No, Judge.

16              THE COURT:  All right.

17              MR. RETURETA:  Your Honor, did we do the

18    dismissal?

19              THE COURT:  Mr. Friedman, you need to dismiss the

20    counts.

21              MR. FRIEDMAN:  Yes.  We move for dismissal of the

22    remaining counts of the indictment in Case 21-cr-4.

23              THE COURT:  Okay.  Because the other one only had

24    one count, the one in Alabama.

25              All right.

```
 1              MR. RETURETA:  And, Your Honor, if I may ask one

 2      more favor of the Court?  If it is feasible, would there be

 3      an opportunity for me to remain on the Zoom link --

 4              THE COURT:  Yes.

 5              MR. RETURETA:  -- with Mr. Coffman to talk with

 6      him?

 7              THE COURT:  No problem.

 8              Mr. Coffman --

 9              MR. RETURETA:  Thank you.

10              THE COURT:  -- I'm hopeful that -- I'm sure that I

11      will not see you again in court.  I think you've learned

12      your lesson.  I still don't have an answer to the question,

13      and I'm not asking you for one.  But think carefully in

14      terms of -- you obviously have family, and you will be

15      still -- from my perspective, you will still be -- have a

16      life ahead of you that you need to forage and figure out

17      what you want to do.

18              Don't shake your head.  You still will.

19              So let me -- we will all get off.

20              Mr. Coffman, stay on.  Don't leave.  Your lawyer

21      is going to stay on.  He can talk to you.

22              We'll be gone so we won't hear what you have to

23      say, okay?  The court reporter will be gone, and the rest of

24      the lawyers and myself will be gone.

25              Good luck.  Take care, all right.
```

1    So the rest of us get off and leave them talking.

2     (Whereupon the hearing was

3      concluded at 11:11 a.m.)

4

5    **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7     I, LISA A. MOREIRA, RDR, CRR, do hereby

8  certify that the above and foregoing constitutes a true and

9  accurate transcript of my stenographic notes and is a full,

10 true and complete transcript of the proceedings to the best

11 of my ability.

12   **NOTE:**  This hearing was held remotely by Zoom or some

13 other virtual platform and is subject to the technological

14 limitations of court reporting remotely.

15     Dated this 4th day of November, 2022.

16

17          /s/Lisa A. Moreira, RDR, CRR

18          Official Court Reporter

           United States Courthouse

19          Room 6718

           333 Constitution Avenue, NW

20          Washington, DC 20001

21

22

23

24

25